We have two argued cases today. Counsel ready to proceed on the first one? Yes, Your Honor. You're reserving three minutes? Yes, Your Honor. Yeah, I'll let you know when you run up against it. Okay. May it please the Court. The examiner rejected appellant's claims in this case as obvious on the ground that the senior reference disclosed an enzyme that inherently possesses low maltose activity. The ward affirmed on the ground that the examiner established a reasonable basis for inferring inherency, thereby shifting the burden to appellant to disprove. In the red brief at 45 and 46, in response to Ikeda's assertion regarding Tsuji's disclosure, Appley notes the omission by Ikeda that Tsuji's AOG-DH preparation shows 0.4 percent enzymatic reactivity to maltose relative to glucose 100 percent. Yes, Your Honor. Doesn't that meet the claim relative glucose over maltose specificity? Yes, it does, Your Honor. But Tsuji is not prior art and Tsuji was like the enzyme preparation in appellant's application, was a highly purified enzyme preparation. So what Tsuji shows in example two is that there is in fact an impurity in these enzyme preparations and that impurity does react with maltose. But you are correct in pointing out that in example one, in the highly purified Tsuji preparation, there was low maltose activity that would be within the scope of the claims that were being prosecuted. Both the highly purified natural one and the recombinant one. That is correct. The recombinant showed no maltose activity. The purified form showed a low amount of activity relative to maltose. Well, can you keep focusing on this purification issue? Yes. I just assume for these purposes that you've made an awfully good point about the board being wrong about inherency. But they have this alternative ground. Yes, Your Honor. That at least with some legal background like Aventis, there would have been a motivation to purify the senior FAD GDH. Yes, Your Honor. And sufficient motivation and a sufficient reasonable expectation that you would get the desired 20 to 1 ratio of glucose to maltose. Yes, Your Honor. So talk about that. My response to that is twofold. First, I do not believe that the examiner has established a basis for suggesting that, excuse me, I lost my train of thought. I think if I remember your argument, at least the part that sticks in my memory, is the idea that nobody would have expected that purification would do more for relative maltose reduction than it did for PQQ. The first point is that I don't believe that the examiner has established motivation to purify. Certainly, there is no prior art that the examiner cites for that proposition. And SUGI, not SUGI, but Senior says expressly that its enzyme preparation need not be extensively purified. In fact, Senior suggests that you can use its enzymes even if they haven't been purified at all. So certainly Senior, there's nothing in Senior to suggest that you should purify its enzyme preparation. period elapses after Senior to the priority date. Is there some point in that period at which it would have become, at which there would have emerged a reason for a skilled artisan recognizing some misreading problem with PQQ to go and purify the FAD? The solicitor has argued that by the time of 1997, when it was reported that the PQQ glucose dehydrogenase was creating problems because it reacted with maltose, has suggested that at that time, one skilled New York would have known that maltose was a potential problem and would have purified. But the PQQ enzyme that was having the maltose activity is the second enzyme disclosed in Senior and the PQQ enzyme inherently has activity to maltose. So the fact that there was a concern that this PQQ enzyme displayed activity to maltose, I don't think would have motivated somebody to purify the FAD enzyme because if you looked at what was causing the maltose activity in PQQ, it was the enzyme. It wasn't the impurity. Was there anything in prior art or in the evidence of record here that indicated after what Senior is? 1983. 1983 up to 2003, I think your priority date or four or something like that, that told skilled artisans that FAD might not have the maltose problem that PQQ did? Nothing in the record, Your Honor. So am I correct that Aikida agrees with the PTAB that enzymes that share the same EC numbers necessarily share the same substrate specificity? For purposes of this appeal, yes, Your Honor. That's correct. Because you sort of say that in your bloopers. The discrete enzyme in one preparation will have the same activity as that enzyme in another preparation. The issue here is the discrete enzyme. What I think the issue is, is that Aikida disputes as it relates to EC numbers, is how identical or not are discrete versus impure enzyme preparations. Is that right? We're disputing, yes. We're saying that what Senior discloses is not the discrete enzyme, does not the enzyme per se. What it describes is an impure preparation. In that preparation, we believe that there are impurities that could well have activity to maltose, almost certainly does have some level of activity to maltose, but certainly we don't think on this record there's a basis to infer that the low maltose activity is inherent. Going back to your other point, Judge Stronto, I don't think there's any, beyond there not being any motivation for purifying the Senior enzyme, I don't believe there's anything in the record that would suggest a reasonable expectation of success that would tell you that if you did purify it, you would get this enzyme that has low maltose activity. And I think that's part and parcel of the prima facie case of obviousness. Can I ask you a very specific question that at least, you have the 2009 FDA report, I think it's 2009, that says from 1997 to 2009 we've had, was it 13 or something, reports of deaths from PQQ sensor, basically because of misreadings. What I couldn't tell from that, and you may know, were those reports publicly known? There's nothing in the record to suggest that they were publicly known. Dr. Turner's declaration reads to me like he thinks this was publicly known, but I couldn't quite tell. Well, there's nothing in the record to suggest that those deaths were publicly reported. There was a report in 1997, there was a report, that's the Docter publication. No, it's not the Docter publication, it's the Winn publication. There was a report that the PQQ enzyme was giving misreading information in patients that were given transfusion with isodextrin. And it suggested that that was potentially dangerous. So there was certainly a report in 1997 that this is a problem and it's potentially dangerous. But as to the actual deaths, we know that they first started, the FDA first started receiving those deaths in 1997. But we don't, I don't, there's nothing in the record to indicate that those are actual deaths. Let me take you back to where Judge Toronto started his questioning with the alternative PTEP finding. It says that even if seniors' FAD-dependent GDH enzyme preparation includes contaminants, it would have been obvious for a posito to modify seniors' purification to obtain better purity yield of GDH, et cetera. Ikeda argues that the PTEP, quote, failed to explain why a posito would have expected the purified preparation to have low activity against maltose. But in the hearing, Ikeda conceded that at most there is evidence that the material activity may not always be less than 5%. And it seems to me to be reasonable for a person of skill to expect success, given this hearing transcript concession combined with the SUGI reference purification method results. How is the fact achieving under 5% may not always occur evidence of no expectation of success?  Well, I don't believe that, well, first off, I think what you're assuming is that somehow a person of ordinary skill in the art would know that maltose is a problem and would know that they should purify the composition to remove maltose. There's nothing in the prior art that indicates that. So if one, even if one was going to sit down and purify, you know, unless you're saying that one normally just routinely would purify and get all impurities out, I don't think that you necessarily would purify it in order to get low activity to maltose. Your yellow light's on, just so you know. Okay, but the other point is, as I mentioned a few minutes ago, as far as the reasonable expectation of success, PQQ enzyme had been purified. It was being used in commercial products. And clearly they would have done everything they could to try and remove any impurities from that under the hypothetical that you're suggesting. And in PQQ, that didn't remove the maltose activity. Why does the fact that purification didn't work with PQQ suggest that overall purification wouldn't be tried? Well, it may have been tried. It may have been, I mean, I think that… And that it led to this problem of false results from the maltose sensitivity was unknown? No. I mean, the problem with PQQ and its maltose, the fact that it reacted with maltose, was known for a long time, from 1986. But I don't see how you can… The examiner can simply say that it would have been obvious to purify in the face, and you would somehow… Was there a general understanding, not just with regard to PQQ, but other types of sensors, that there was a problem or a potential problem of false readings due to maltose sensitivity? Other than PQQ, no, as far as I know. But, again, Senior itself says you don't need to purify. So you have an expressed teaching that you don't need further purification. And then it seems to me that if you're going to say, well, it just would have been obvious to purify it, there has to be something more than just the examiner saying, everyone knows that you would want to purify it to get out the impurities. When the principal reference that you're relying on says it's not necessary in this particular application, which is measuring glucose concentration. And just so I'm clear, there are two points about motivation and then reasonable expectation. Even if you were motivated, you have a separate, though obviously related point, that there's no reason, you say, to have expected success for NAD any more than for PQQ. Correct. Thank you. We have your time. I'll give you two minutes. Thank you. Counsel. Good morning, Your Honors, and may it please the Court. Aikida seeks to withdraw from the public Senior's disclosure of using a purified fad GDH enzyme in a glucose biosensor. Because Aikida is now claiming an inherent property of a purified fad GDH enzyme preparation. For at least three reasons, we ask this Court to affirm the Board's decision. One is based on just Senior's disclosure, what it discloses as a whole, Senior's specific enzyme prep, and also then the third is the obvious to purify. In the blue brief, Aikida says at 28, quote, no prior art suggested that purifying Senior's EC 1.199.10 enzyme preparation would yield an enzyme preparation with low activity against maltose. How do you respond and what's your best evidence to the contrary? So I take it that there was a motivation to purify at the time of Aikida's filing date, Senior's 1986 or 83. And Aikida, by the time of Aikida's filing date, there's a motivation to purify because we now know that there's patients taking drugs that results in maltose in their bloodstream. And that you have a problem whether you have an enzyme that has intrinsic activity to maltose or if you have a contaminant to maltose, you're going to have a problem for that patient population. So based on the evidence that Aikida put forward for... What's the evidence for that? I mean, I understand that argument, but when I looked at the Board's reasoning on this, I think we're talking about the alternative ground, it kind of just says it. It doesn't really cite a whole lot. Well, I think the examiner first relied on it in the answer. And the examiner was relying on what Aikida was presenting for a long-felt need. At the time, Aikida is saying there's a long-felt need for a new enzyme that doesn't have this activity to maltose. So by the time of their priority date, the examiner is essentially relying on that. At that time, we have this evidence that PQQ GDH enzyme has activity to maltose. And then we have reports that are a decade after Senior, but reports of maltose in the bloodstream of certain patients who are taking drugs. And that evidence that they're essentially putting forward for a long-felt need, though wouldn't support a finding of a long-felt need, did support a motivation to purify an enzyme. And I think... Can I just ask on this report, do you have any different information about whether an ordinary skilled artisan knew about these reports of the PQQ death problem? There was an article that was published in 1998, which talked about the problem of having this higher maltose activity in the patient, suggesting that there could be a death problem. This is the WENS article? I think it is the WENS article, yes. So there's no evidence that the FDA reports of death starting in 1997 in public, but there is public data that was put forth for the long-felt need that there was this risk to particular patients that were taking drugs that put maltose in their bloodstream. So that supports a motivation to purify away any maltose activity. I think Aventis and Spectrum support a motivation to purify a mixture, regardless of whether there's anything more explicit about it, because we have this known desired property of the mixture, this enzyme activity. But that can't be kind of a blanket rule. There may be some times where purification is completely unnecessary, and so it would be added steps, added cost. I don't think you can assume that purification is always obvious for somebody, a skilled artisan, to do, can you? I think that's true. You have to have some reason to do it. I think that's true. There has to be some level. To some level, when you're talking about using something in a glucose biosensor for patients, and you know out there that there's a problem with other sugars that could occur in the bloodstream, I think that is definitely sufficient for a motivation to combine, I'm sorry, a motivation to purify the enzyme away if you were going to use it to then treat patients. Can I just ask on the Aventis point, why wouldn't one read Aventis as applied here to say that the crucial premise of a property in a substance, that the crucial property here is not sensitivity to glucose, but comparative 20 to 1 sensitivity of glucose to maltose, and that there just wasn't a reason to know. There wasn't a reason to know, but I guess that goes back to there wasn't a reason to know, but there was a reason to be worried about maltose, and there was a reason to know that there's maltose hydrolyzing enzymes. But very specifically on the Aventis case, which you place a fair bit of reliance on, the sentence that says when you know that something has a particular property, it's sort of presumed that you would have a reason to purify it. The particular property here is a relative one, and I don't remember that there's anything that tells us that the world of public knowledge included knowledge of the relative 20 to 1 property of the FAD. That's true until Aikido shows the inherent property of the purified enzyme preparation in Table 1. We don't know about the enzyme's activity to maltose. We do know that it's been given an EC number that defendifies it as a glucose dehydrogenase, and that fourth number, the 1-0, is the substrate specificity that has been characterized for that enzyme. So reasonably we expect that it would have glucose specificity, and if we're worried about- I'm sorry, but specificity does, I think, tell me if I'm wrong, not include information about whether it's also reacting to an unfortunate degree with something other than glucose. That's true, but I guess the ARC didn't know about this maltose property, about whether this enzyme or not had activity to maltose relative to glucose, but the Senior did disclose using a purified FAD GDH enzyme, and it's tracking a specific property, which is the EC number, which is an activity to glucose, and I think not only based on that disclosure and the knowledge, the enablement in the ARC that you could purify it to the level of purity that would give you this inherent property, but that Senior particularly purified its enzyme and said it had the ability to use it in a glucose biosensor. Aikido is now claiming an inherent property of that purified enzyme, and the inherent property doesn't have to be known in the prior ARC. Can you just clarify what you mean by Senior discloses a purified FAD GDH? Senior discloses using a purified FAD GDH enzyme preparation. What are you pointing to? I thought the kind of whole point here is that the... It says, so this is an APPX 287. It's the first full paragraph where it starts when. When used in the method of the invention, the enzyme may be in any form, e.g., a purified enzyme, and there's no dispute that one of skill in the ARC could have purified... But why is that anything other than saying we've got this, forgive the expression, soup. It includes this enzyme. We say we don't think it matters very much how pure it is, and you're taking from that a disclosure of the purified because it has mentioned that no matter how pure, it will have a beneficial property. The prior ARC is... There was no testing or anything. There's no testing, but you don't have to have testing if it's an inherent property. You can't make a patentable distinction between what you're claiming now and what was in the prior ARC based on an inherent property, even if that inherent property isn't known. Here we have a disclosure of an EC enzyme preparation, and IKEDA also is disclosing not the enzyme per se, not telling you anything about what that enzyme per se is activity, but an enzyme preparation. There's no way that the board or the examiner relied on an enzyme per se. They were relying on the fact that the prior ARC teaches purifying a FAD-GDH enzyme from this gamish of fungi cells and then characterizing it as having this glucose dehydrogenase activity, and that is a reasonable basis to think that these two gamishes, either just a disclosure and an enablement of using a purified enzyme or a senior's particular preparation, inherently has the substrate specificity, the low maltose-to-glucose claimed activity as senior's preparation. And senior's only answer is there is this maltose hydrolyzing contaminant, and that Shuji tells you that there's this contaminant in the preparation. But as Judge Wallach noted, that contaminant does not result in a high maltose activity relative to glucose. You still have lower than 5% activity of maltose relative to glucose in these preparations. So the board said there's no evidence of this contaminant, and even if there was evidence of this contaminant, it still then would inherently have this low activity to maltose relative to glucose. And so the PTO doesn't have the ability to test prior ARC compositions and compare them to Aikida's. So the only thing the PTO can do is say we have these substantially similar preparations. They've both been classified as known enzymes based on their EC numbers. Let me see. I guess I'm confused about this. Sometimes you're talking about the preparation used in senior, which I actually took it to be what the board was focused on. But at times you seem to be making an argument that says senior mentions NADGDH. It uses the term purity. So it thereby teaches a pure NADGDH under Schering and the Clareton case. It doesn't matter when you discover an inherent property. If it's inherent, then all done anticipation. Are you making that as a separate point? There's two separate arguments. I'm saying that senior discloses using a purified VADGDH enzyme preparation because there's no enzyme to teach at this point because there's no recombinant enzyme. So when I say enzyme, I mean enzyme preparation, even if I don't say preparation because that's all there is. Senior teaches using this VADGDH enzyme preparation. And even if senior's particular embodiment is inoperative or something's wrong with it, it doesn't take that disclosure using this purified VADGDH enzyme out of the prior ARC as long as it's enabled. So the Purdue Pharma case where you have one a day, a 24-hour tramadol treatment, and the prior ARC didn't actually show this particular 24-hour treatment with tramadol, but it would have been enabled because one of skill in the ARC could have done it. One of skill in the ARC could have purified it. All of these protein purification methods that are being used are well-known, ordinary methods. And so, therefore, Senior discloses the VADGDH enzyme in two ways. By saying it's the purified enzyme, if it had never done an enzyme preparation, that disclosure is not taken away from the prior ARC. But he also then purified the VADGDH enzyme and characterized it based on it having this EC number. An EC number already tells you that this enzyme is an enzyme that's been published and characterized in the prior ARC. And what Akita is doing is claiming this inherent property of that purified GDH enzyme and trying to get a claim on it. So on that theory, could the case here of anticipation have been made without Senior just saying, look at this EC classification? I think so, yes. But Senior gives you the motivation to use it in a glucose biosensor. So the particular use that's being claimed now is the use of this enzyme to calculate the amount of glucose in a blood sample. It isn't an anticipation rejection. It's obviousness because there's a bit of a structure that's relied on by UGAWA. But it's essentially a 102 for the enzyme preparation. Can I ask you to return to, I'm sorry, this was kind of a long detour from, I think, a discussion that began to focus on the purification. A pair of issues. One is motivation, and the second is a basis for reasonably expecting success that purifying FAD would be better for these purposes, namely reducing maltose reactivity, than purifying PQQ. What evidence in the real world known to skilled artisans would have generated such an expectation? So the reasonable expectation of success comes from the fact that it is classified as a glucose dehydrogenase. Other glucose enzymes have been purified and don't have any intrinsic activity to maltose. Glucose oxidase, the NADH, FAD, that was used prior that had the separate cofactor, also has no intrinsic activity to maltose. PQQ, GDH does. But just because one of the enzymes does, doesn't mean you wouldn't have a reasonable expectation of success of purifying it and it not having intrinsic activity. It's not 100%, but it doesn't have to be 100% for a reasonable expectation of success. And in fact, the activity of PQQ... I mean, our law just tells us almost nothing about where south of 100% reasonable is. But it's not like there's one GADH enzyme, it has been purified, and it has activity to maltose. You have other enzymes that have been used for glucose biosensors, and they don't have intrinsic activity to maltose. They were purified, and if there was any, it was a contaminant. And here, the PQQ, GDH enzyme was never really tested for maltose until later, indicating it's sort of a surprise, perhaps, that this enzyme had this activity because no one was looking for it when they initially isolated. See, I'm out of time, so unless there's any other questions, we'd ask this court to affirm the court's decision. Thank you, Your Honors. I like the way you think, counsel. Not what you think, but you think in paragraphs. I like it. Thank you, Your Honor. I'm not saying I dislike what you think, I'm just saying. He's digging. Just a couple of points, Your Honor. The claims that are pending are not removing anything from the prior art, as the solicitor has argued. The claims are for a particular type of biosensor. It's a different type of biosensor than what was in Senior. Well, can you focus very specifically on that? Because I guess I think I was learning something about what might be a couple of different arguments that maybe before today's argument I had been joining. Forget about the preparation that Senior actually did experiments on and used. Yes. I understand the government to be saying that, in addition, Senior said biosensor with a set that didn't make or test a FAD-GDH in pure form. And as long as it disclosed it in a biosensor, you are doing nothing but identifying a leader-discovered inherent property, namely a 20-to-1 ratio of glucose to maltose reactivity. Tell me what your answer is to that. Well, Senior doesn't disclose using the enzyme. It discloses using an enzyme preparation. I think I take it, and maybe I've misunderstood, that at page 289, you know the first one. Is it 289 or 287? 287, I'm sorry. When used in the method of the invention, the enzyme may be in any form, e.g. purified enzyme in a crude cellular extract or contained in whole microbes. And I think the government was saying that discloses something that Senior and his people never actually did, but it discloses using a pure FAD-GDH in a biosensor. Did the board find that? No. If you read the Senior in its entirety, I think what the purification they're talking about there is the purification that took place in their example, which was an eight-fold purification. Later on... I see. So purified is not an either-or kind of thing. No. The example in the application took ruptured cells, and then it centrifuged them out, and then it passed them over a one-stage column to purify it, and it increased the amount of GDH by about eight-fold, it said. That is still a very crude preparation. It is somewhat purified. I'm letting you run over a bit. Okay. But as we showed and explained in our brief, the preparation that we've used is... than the one that we used, demonstrating that the senior enzyme preparation that is actually disclosed is very different from the enzyme preparation in our application that was relied on by the examiner as the basis for the inherency argument. Time's up. Thank you.